

**SO ORDERED.**

**SIGNED this 26 day of September, 2011.**

_Dale L. Somers_
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et. al.,** | **CASE NO. 08-22786** |
| | **CHAPTER 7** |
| **DEBTORS.** | |
| **ALBERT A. RIEDERER, Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc.,** | |
| **PLAINTIFF,** | |
| **v.** | **ADV. NO. 10-6225** |
| **BROOKE HOLDINGS, INC., LELAND ORR, ANITA LOWRY, KIMBA K. ORR, CASEY R. ORR, NICHOLAS S. RHODES, WANDA R. SCHMIDT, STEVEN R. SCHMIDT, MICHAEL LOWRY, BRETT A. BIGGS, CHAD S. MAXWELL, ALFRED MARCOTTE, AND LOGAN WILDLIFE CORPORATION,** | |
| **DEFENDANTS.** | |

## REPORT AND RECOMMENDATION TO THE DISTRICT COURT ON MOTION TO WITHDRAW THE REFERENCE

This adversary proceeding is before the Court on the Motion to Withdraw the Reference filed by defendants Brooke Holdings, Inc., Leland Orr, Kimba K. Orr, Casey R. Orr, Nicholas S. Rhodes, Wanda R. Schmidt, Steven R. Schmidt, Chad S. Maxwell, Alfred Marcotte, and Logan Wildlife Corporation (collectively "Defendants").[1]  Pursuant to District of Kansas Local Rule 83.8.6, the Court makes the following recommendation that reference of this case not be withdrawn.

**FACTUAL AND PROCEDURAL BACKGROUND.**

Albert A. Riederer, the Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation, and Brook Investments, Inc. (collectively "Brooke"), initiated this adversary proceeding against Brooke Holdings, Inc., and others by filing a Complaint on October 26, 2010.  The instant case is one of approximately 84 separate adversary proceedings filed by the Trustee against approximately 460 defendants.  The case is one of 10 complaints grouped by the Trustee in Category D, described as "a catch-all miscellaneous category which encapsulates all other complaints that the Trustee filed."[2]

The Plaintiff-Trustee alleges that Brooke was an insurance agency franchisor founded and controlled by Rob Orr.  Rob Orr and his brother, Leland Orr, controlled

---

[1] Dkt. no. 50.  All named defendants except Anita Lowry, Michael Lowry and Brett A, Biggs joined in the Motion.  A notice of the voluntary dismissal of Defendant Michael Lowry has been filed by the Trustee.  Dkt. no. 52.

[2] Case No. 08-22786, dkt. no. 1650, Trustee's Omnibus Procedures Motion at 4.

2

Brooke Holdings, Inc., a family-owned holding company which owned the controlling interest in Brooke Corporation.  Brooke Corporation  and Brook Capital filed for Chapter 11 bankruptcy relief in October 2008, and Brooke Investments filed in November 2008. The Trustee was appointed Chapter 11 Trustee and was subsequently appointed Chapter 7 Trustee when the Brooke cases converted to Chapter 7 in June 2009.  In this action, the Trustee seeks to avoid, pursuant to §§ 544, 547, 548, 550, and 551 of the Bankruptcy Code, certain transfers which were made by Brooke to Brooke Holdings, as preferences and fraudulent transfers and to recover the transfers from Brooke Holdings, Orr family members, and other individuals who were shareholders of Brooke Holdings.  The Complaint also prays for disallowance and subordination of certain claims.

On May 20, 2011, within 20 days after entering an appearance,[3] Defendants filed the Motion to Withdraw the Reference.  The Trustee opposes the Motion.  The Court has jurisdiction.[4]

**ANALYSIS.**

Defendants move to withdraw reference pursuant to 28 U.S.C. § 157(d), which provides:

---

[3] Defendants contend the Motion is timely under D. Kan. Rule 83.8.6(c), and the Trustee does not contend otherwise.

[4] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984.  Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C), (F), and (H).  There is no objection to venue or jurisdiction over the parties.

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

The subsection creates two bases for withdrawal of reference:  Mandatory withdrawal when the case requires consideration of both the Bankruptcy Code and other federal laws regulating organizations and activities affecting interstate commerce; and permissive withdrawal for cause.  Defendants rely primarily upon mandatory withdrawal of reference, contending that the case requires consideration of both the Bankruptcy Code and federal securities laws.  As to permissive withdrawal, Defendants assert that judicial efficiency and economy would be served by withdrawal.

### A.  The Conditions for Mandatory Withdrawal of Reference are not Present.

"The principal case"[5] interpreting mandatory withdrawal of reference is *White Motor Corporation*.[6]  That case "formulated the test that is now followed by most courts which requires 'substantial and material' consideration of nonbankruptcy federal law in order to trigger § 157(d)'s applicability."[7]  The *White Motor Corporation* construction of

---

[5] 1 *Norton Bankr. L. & Prac. 3d*, § 8.2 at p. 8-16 (William L. Norton, Jr., ed.-in-chief, Thomson Reuters/West 2011).

[6] *In re White Motor Corp.*, 42 B.R. 693 (N.D. Ohio 1988).

[7] 1 Norton Bankr. L. & Prac. 3d at § 8.2 at p. 8-16.

4

the statute has been followed in this district,[8] and neither party urges departure from this narrow construction of mandatory withdrawal of reference.  Under this standard, "consideration of the non-Code law must entail more than its routine application to the facts."[9]  "Withdrawal is required if the bankruptcy court would be called upon to make a significant interpretation of a non-Code federal statute."[10]  Mandatory withdrawal has thus been reserved "to those cases where substantial and material consideration of non-Code federal statutes is necessary for the resolution of the proceeding."[11]

Defendants argue that the "Court must withdraw the reference of the Complaint . . . , because the Complaint necessarily implicates the Securities Laws."[12]  The Court does not agree.  For the following reasons, the Court finds the resolution of the Complaint will not involve "substantial and material consideration" of the federal securities laws.

The Complaint alleges no causes of action against any of the Defendants under the Securities Act of 1933, the Securities Exchange Act of 1934, or any other federal law other than the Bankruptcy Code.  The references to the federal securities laws in the

---

[8] *American Freight System, Inc., v. Interstate Commerce Comm'n (In re American Freight System, Inc.)*, 150 B.R. 790, 792-95 (D. Kan. 1993); *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 150 B.R. 976, 979-81 (D. Kan. 1993).

[9] *American Freight System*, 150 B.R. at 793 (citing  *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2nd Cir. 1990),  *In re Coated Sales, Inc.*, 146 B.R. 83, 84 (S.D.N.Y. 1992), and *In re National Gypsum Co.*, 145 B.R. 539, 541 (N.D. Tex.1992)).

[10] *Id.* (citing *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2nd Cir.1991) and *Wittes v. Interco Inc.*, 137 B.R. 328, 329 (E.D. Mo.1992)).

[11] *Id.*

[12] Dkt. no. 50, p. 6.

5

Complaint on which Defendants rely when arguing in favor of mandatory withdrawal of reference are included in the common factual allegations under the section entitled "improper revenue recognition."  After alleging Brooke's reliance upon revenues from initial franchise fees, the Complaint sets forth the accounting practices relating to this income which resulted in reporting of positive equity when in fact, as alleged by the Trustee, "the Debtors were continuously insolvent from 2003 through their respective bankruptcy filings."  The allegedly improper accounting practices are stated in paragraphs 57 through 61 as follows:

> 57.    Pursuant to Generally Accepted Accounting Principles ("GAAP") and relevant SEC guidelines, initial franchise fee revenues must be systematically recognized over the expected life of the franchise relationship.  The reason for this, among other things, is Brooke's continuing obligations to provide various services to franchisees.

> 58.    Brooke, however, fully recognized the revenues from the initial franchise fee at the inception of the franchise relationship.

> 59.    Brooke's policy of fully recognizing initial franchise fee revenues at the inception of the franchise relationship constituted a clear violation of GAAP and relevant SEC guidelines.

> 60.    In various SEC filings and disclosures, Brooke reported significant amounts of equity. This equity was, however, an illusion resulting from, among other things, Brooke's improper, up-front recognition of initial franchise fee revenues and Brooke's failure to record loan loss allowances associated with franchisees who were unable to service their debt.

> 61.    Indeed, if Brooke had properly followed GAAP and

6

> relevant SEC guidelines, its equity for 2003 through 2007
> would have been as follows: [negative equity in all years,
> ranging from $9.5 to $96.8 million].

Defendants' argument is that the "Complaint necessarily implicates the Securities Laws" and that the allegations of insolvency are predicated "on the failure of the Brooke entities to comply with applicable Securities Laws."[13]  Defendants argue that "this necessary and fundamental allegation is sufficient to require withdrawal of the reference because it <u>requires</u> the application of Securities Laws."[14]

The Trustee responds that at most Defendants have shown that "[SEC] guidelines may have some relevance in 'evaluating the legitimacy' of Brooke's 'accounting methods and its inclusion or exclusion of certain items' in its financial settlements."[15]  He relies upon two recent adversary cases, *Anderson*[16] and *Rodriquez*,[17] brought by Chapter 13 debtors alleging that Countrywide, their mortgage lender, violated the Bankruptcy Code with respect to postpetition payments.  Countrywide moved for mandatory withdrawal of reference based upon federal law under the Home Owners' Loan Act (HOLA) and the Real Estate Settlement Practices Act (RESPA).  The courts found that mandatory withdrawal was not required.  The *Anderson* court stated, "The mere fact that HOLA

---

[13] *Id.*

[14] *Id.*

[15] Dkt. no. 51, p. 9.

[16] *Anderson v. Countrywide Home Loans, Inc. (In re Anderson)*, 395 B.R. 7 (E.D. Mich. 2008).

[17] *Rodriquez v. Countrywide Home Loans, Inc.*, 421 B.R. 341 (S.D. Tex. 2009).

7

and/or RESPA may be 'implicated' . . . does not suffice to require withdrawal of the reference.  At most, Countrywide has shown only that these statutes may have some relevance in evaluating the legitimacy of Countrywide's accounting methods and its inclusion or exclusion of certain items from its claim."[18] Countrywide had not demonstrated that the bankruptcy court would "be required [to] make a 'significant interpretation'" of the federal statutes "or that it will have to do anything more than apply established law to the facts of this particular case."[19]  The *Rodriquez* court cited *Anderson* with favor, and agreed with the bankruptcy court's report, which concluded that, "at most, it may have to apply RESPA to understand how payments were allocated, but that such application would only involve an application of settled law."[20]  The Court finds the analysis of *Anderson* and *Rodriquez* to be correct.

Defendants have failed to convince the Court that a "significant interpretation" of federal securities laws will be required to resolve this Complaint.  The avoidance causes of action under the Bankruptcy Code require proof of insolvency.  However, the Code, not federal securities laws or guidelines, defines insolvency.[21]  Determinations of insolvency are frequently made by bankruptcy courts with respect to debtors who are subject to federal securities laws.  Insolvency will be an issue in many of the numerous

---

[18] *Anderson*, 395 B.R. at 11.

[19] *Id.*

[20] *Rodriquez*, 421 B.R. at 349.

[21] 11 U.S.C. § 101(32(A).

8

adversary complaints pending in the Brooke cases.  The allegations of the Complaint are

sufficient for the Court to conclude that the SEC guidelines, as well as GAAP guidelines,

will be relevant in the Trustee's evidence of insolvency.  However, Defendants have

failed to establish that resolution of the Complaint will require deciding a substantial and

material question of federal securities law.

### B. Cause for Discretionary Withdrawal of Reference is not Present.

Defendants also seek discretionary withdrawal of reference for cause.  "Cause" is

not defined by the withdrawal statute.  A demand for a jury trial is recognized as cause.[22]

In addition, district courts have been directed to "consider the goals of promoting

uniformity in bankruptcy administration, reducing forum shopping and confusion,

fostering the economical use of the debtors' and creditors' resources, and expediting the

bankruptcy process."[23]  Permissive withdrawal is discretionary.

In this case, the cause cited by Defendants is "judicial efficiency and economy."

Defendants assert that SEC litigation is "complex and specialized" and traditionally heard

by the district courts.  Of course, as found above, this is not SEC litigation; the claims in

this case arise under the Bankruptcy Code.  Insolvency is defined by the Bankruptcy

Code.  Whether and when Brooke became insolvent will be an issue in many of the

---

[22] *E.g., Manley Truck Line, Inc., v. Mercantile Bank of Kansas City*, 106 B.R. 696, 697 (D. Kan. 1989); *see* cases collected at 1 *Collier on Bankruptcy*, ¶ 3.04[1][b], n. 4 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2011).

[23] *Holland America Ins. Co. v. Succession of Roy,*  777 F.2d 992, 999 (5th Cir.1985).

9

pending adversary cases.  Judicial efficiency and economy will be served by denying the motion to withdraw reference.

**CONCLUSION.**

For the foregoing reasons, the Court recommends that the Motion to Withdraw the Reference be denied.  The conditions for mandatory withdrawal are not present, since resolution of this proceeding will not require substantial and material consideration of non-Bankruptcy-Code federal statutes.  In addition, there is no cause for discretionary withdrawal of reference.

A copy of the Complaint is attached for the convenience of the District Court.

# # #

Category D

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS
### KANSAS CITY DIVISION

| | |
|---|---|
| *In re*: | |
| **BROOKE CORPORATION, et al.,** | **Case No. 08-22786-DLS** |
| | **(Jointly Administered)** |
| **Debtors** | **Chapter 7** |
| **Albert A. Riederer, Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation and Brooke Investments, Inc.,** | |
| **Plaintiff,** | |
| **vs.** | **Adv. No. _____** |
| **Brooke Holdings, Inc., Leland Orr, Anita Lowry, Kimba K. Orr, Casey R. Orr, Nicholas S. Rhodes, Wanda R. Schmidt, Steven R. Schmidt, Michael Lowry, Brett A. Biggs, Chad S. Maxwell, Alfred Marcotte, and Logan Wildlife Corporation,** | |
| **Defendants.** | |

## COMPLAINT

COMES NOW Plaintiff Albert A. Riederer, Chapter 7 Trustee ("Trustee") of Brooke Corporation ("Brooke Corp."), Brooke Capital Corporation ("Brooke Capital"), and Brooke Investments, Inc. ("Brooke Investments") (Brooke, Brooke Capital and Brooke Investments are collectively referred to as "Debtors") and for his Complaint against Brooke Holdings, Inc., Leland Orr, Anita Lowry, Kimba K. Orr, Casey R, Orr, Nicholas S. Rhodes, Wanda R. Schmidt, Steven R. Schmidt, Michael Lowry, Brett A. Biggs, Chad S. Maxwell, Alfred Marcotte, and Logan Wildlife Corporation (collectively "Defendants") states and alleges as follows:

### Introduction

1.      This is an adversary proceeding brought in the above-captioned bankruptcy cases pursuant to Part VII of the Bankruptcy Rules seeking to avoid certain preferential and/or

KCP-4060589-5

1

fraudulent transfers made by one or more of the Debtors to the above-captioned defendant ("Defendant") and to recover the value thereof pursuant to 11 U.S.C. (the "Bankruptcy Code") §§ 544, 547, 548, 550 and 551.

    2.    It is the Trustee's express intent to avoid all transfers that may be avoided and recovered.  These include not only the transfer identified herein but all others that occurred.

<u>**Parties**</u>

    3.    Plaintiff Albert A. Riederer is the Chapter 7 Trustee of Brooke Corp., Brooke Capital and Brooke Investments.

    4.    Defendant Brooke Holdings, Inc. is a Kansas corporation.  It may be served through its registered agent, Leland Orr, 250 West State Street, Phillipsburg, Kansas 67661.

    5.    Defendant Leland Orr is an individual who may be served at 501 Berglund Drive, Phillipsburg, KS 67661.

    6.    Defendant Anita Lowry is an individual who may be served at 790 Q Rd., Plainville, KS 67663.  Anita Lowry is the sister of Rob Orr and Leland Orr.  She served as the Vice President and Treasurer of Brooke Corp.

    7.    Defendant Kimba K. Orr is an individual who may be served at 14062 150 Rd., Smith Center, KS 66967.  Kimba Orr is the wife of Rob Orr.  Rob and Kimba Orr are the parents of Casey Orr and the in-laws of Nicholas S. Rhodes.  Wanda Schmidt is the mother of Kimba Orr and Steve and David Schmidt.

    8.    Defendant Casey R. Orr is an individual who may be served at 4194 S. Ouray Way, Aurora, CO 80013.  Casey Orr is the son of Rob and Kimba Orr.  Casey Orr served as the Director, Vice President and Treasurer of Brooke Investments.

9.      Defendant Nicholas S. Rhodes is an individual who may be served at 17022 K Rd., Smith Center, KS 66967.  Nicholas Rhodes is the son-in-law of Rob and Kimba Orr. Nicholas Rhodes served as the Vice President of Brooke Capital and the Vice President and Secretary of Brooke Investments.

10.      Defendant Michael Lowry is the nephew of Rob Orr and the son of Anita Lowry.

11.      Defendant Steven R. Schmidt is an individual who may be served at 27062 O Rd., Gaylord, KS 67638 and/or 210 Locust Street, Smith Center, KS 66967.  Steven Schmidt is the son of Wanda Schmidt and the brother-in-law of Rob Orr.

12.      Defendant Wanda R. Schmidt is an individual who may be served at 305 Burr Ter., Smith Center, KS 66967.  Wanda Schmidt is Rob Orr's mother-in-law.

13.      Defendant Brett A. Biggs is an individual who may be served at 457 I Street, Phillipsburg, KS 67661.  At all times relevant to this matter, Brett Biggs owned approximately 1-2% of Brooke Holdings.

14.      Defendant Chad S. Maxwell is an individual who may be served at 35865 W. 215th Street, Edgerton, KS 66021.  Chad Maxwell served as the Senior Vice President of both Brooke Capital and Brooke Investments.

15.      Defendant Alfred Marcotte is an individual who may be served at 306 Main Street, Morganville, KS 67468.  Upon information and belief, Alfred Marcotte or his deceased wife, Maxine, is cousins of Alexine Paden, the mother of Rob Orr, Leland Orr and Anita Lowry.

16.      Defendant Logan Wildlife Corporation is a Kansas for profit corporation.  It may be served through its registered agent, Casey Orr, 14064 150th Road, Smith Center, KS 66967. Upon information and belief it is owned,  in whole or in part, and/or controlled, in whole or in part, by Casey Orr.

Category D

## Jurisdiction and Venue

17.     This Court has jurisdiction over this proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157.

18.     This Court has venue over this proceeding under 11 U.S.C. §§ 1408 and 1409.

## Facts Common to All Counts

19.     Through mid 2007, Brooke Holdings was the majority shareholder of Brooke Corp.  Following that point, Brooke Holdings lost its majority ownership in Brooke Corp. but Brooke Holdings maintained an ownership interest in Brooke Corp. well in excess of 20% of its outstanding stock.  As such, Brooke Holdings constitutes an "insider" (as that term is defined by the Bankruptcy Code) of the Debtors at all times relevant to this adversary proceeding.

20.     Brooke Corp. owns approximately 81% of the stock of Brooke Capital who, in turn, owns 100% of the stock in Brooke Investments.

21.     Brooke Corp. and Brooke Capital filed voluntary Chapter 11 petitions on October 28, 2008 in the Bankruptcy Court for the United States District of Kansas.  Brooke Investments filed a voluntary Chapter 11 petition on November 3, 2008 in the Bankruptcy Court for the United States District of Kansas.

22.     On October 29, 2008, the Court entered an Order appointing Albert Riederer as the Chapter 11 Trustee of Brooke Corp. and Brooke Capital.  On November 13, 2008, the Court entered an Order appointing Albert Riederer as the Chapter 11 Trustee of Brooke Investments effective as of its petition date, November 3, 2008.

23.     On June 29, 2009, this Court entered an Order converting these proceedings to Chapter 7 and noted the U.S. Trustee's decision to appoint Albert Riederer as Chapter 7 Trustee of the Debtors upon conversion of these cases. (Docket No. 700).

24.     As the representative of the bankrupt estate, the Trustee is authorized to pursue all causes of action that belong to the estate as well as any applicable state law avoidance actions. 11 U.S.C. §§ 323(b) and 544(b).  This includes all fraudulent conveyance actions under the Uniform Fraudulent Transfer Act which Kansas has adopted.

25.     Exhibits 1 and 2 identify monies that Brooke Corp. transferred to Brooke Holdings in the four-year period preceding the Debtors' bankruptcy filings.  Exhibit 3 identifies transfers that Brooke Holdings subsequently made to various insiders and/or other parties.

26.     Exhibits 1, 2, and 3 set forth the Trustee's current knowledge of the transfers made to the Defendants which may be avoided and recovered.  During the course of this adversary proceeding the Trustee may learn of additional transfers made by the Debtors to the Defendants.  It is the Trustee's intention to avoid and recover transfers that may be avoided pursuant to Chapter 5 of the Bankruptcy Code, whether or not such transfers are currently set forth on Exhibits 1, 2 or 3.

### *The Orrs involvement with the Debtors*

27.     Robert Orr served as CEO of Brooke Corp. from 1986 through October 1, 2007. Orr served as the Chairman of Brooke's Board of Directors from 1991 through September 17, 2008 and finally resigned from the board in October 2008.

28.     Leland Orr served as the CFO of Brooke Corp. from 1995 to March 11, 2008.  At that time, he became the CEO of Brooke Corp. until approximately mid-October 2008.  Leland Orr also served on the Board of Directors from 1986 through October 9, 2008.

29.     Rob Orr served as Chairman of the Board of Brooke Capital in 2007 and 2008. During those same years, he also held various officer positions with the company.

30.     Leland Orr served as the CFO of Brooke Capital in 2007 and 2008.

31.     Given Brooke Investments' status as a captive subsidiary of Brooke Capital who, in turn, was controlled by Brooke Corp., both Rob Orr and Leland Orr had the position and authority to direct the affairs of Brooke Investments at all times relevant to this matter.

32.     At all relevant times to this matter, Rob Orr and Leland Orr controlled and/or directed the affairs of Brooke Corp.

33.     At all times relevant to this matter, Rob Orr and Leland Orr directed and/or controlled the affairs of Brooke Holdings.

### Brooke's Unsustainable Business Model

34.     Brooke Corp. operated primarily through its operating subsidiaries:  Brooke Credit Corporation ("Brooke Credit"), which later changed its name to Aleritas Capital Corporation ("Aleritas")[1] and Brooke Franchise Corporation ("Brooke Franchise"), which later merged into Brooke Capital.  Unless otherwise noted, Brooke Corp. and its various subsidiaries are collectively referred to as "Brooke."

35.     During the first ten years of its existence, Brooke primarily sold administrative services to bank-owned insurance agencies.  In 1996, Brooke established a franchise model for expansion and developed a lending program to facilitate acquisition of existing insurance agencies by Brooke franchisees.

36.     From 1996 to 2000, Brooke's revenues consisted almost entirely of a percentage of commissions earned by its franchisees, which Brooke retained in exchange for administrative services provided to the franchisees.

37.     In 2001, however, Brooke began to restructure its operations and create additional sources of revenue.  Specifically, it:

---

[1] Brooke owned 100% of Aleritas stock through mid 2007 when it sold 38%.

**Category D**

    a.      Began charging consulting fees to prospective franchisees in conjunction with the franchisee's acquisition of a franchise (referred to as "BAP" fees); and

    b.      Began realizing gains on the sale of loans it had initiated.

38.    Through the end of 2003, all Brooke franchises were conversion agencies, meaning that the franchisee owned or acquired an existing agency when it signed up to become a Brooke franchisee.

39.    When a franchise was acquired, Aleritas would typically loan the franchisee the entire amount it needed to purchase the franchise.  Franchisees would then use the proceeds of the loan to pay Brooke Capital the associated fees.

40.    Prior to 2003, Brooke employed a business model whereby it would fund loans by selling participation interests in individual loans.  In 2003, however, Brooke started using loan securitizations as well as loan participations.  Loan securitizations involve a finance process that distributes risk by aggregating assets into a pool and issuing new securities backed by those assets and their cash flows.  The securities are then sold to investors who share the risks and rewards of the assets.

41.    By the end of 2007, approximately 45% of the total loans Brooke had initiated had been securitized in seven securitizations.  Brooke was required to over-collateralize the securitizations, which meant Aleritas had to absorb the first 15-25% of losses in any given securitization before investors would lose any of their interest in the remaining percentage of the loan.

KCP-4060589-5

7

42.     Of the remaining loans that had been initiated by Brooke, 35% had been sold without recourse to participating banks but another 20% remained unsold and on Brooke's books.

43.     Notwithstanding Brooke's apparent lessened exposures to the loans it had initiated, Brooke was under tremendous pressure for all the loans to perform because its business model depended on a continuous stream of willing buyers for its loans.

44.     Between 2004 and 2007, Brooke experienced tremendous growth in the number of its franchise agencies.  The success of a significant number of those franchise agencies was, however, questionable.

45.     In 2004, Brooke also began a program of start-up agencies ("SUPs") where the franchisee was recruited and setup in a new agency without the benefit of existing business.  Again, almost all of the costs for SUPs were financed through loans provided by Aleritas.

46.     The success rate for SUPs was abysmal.  As of September, 2008, less than one-third of the SUPs were able to timely meet their payment obligations.

47.     In many instances, the commission revenues of Brooke franchisees in both conversion and SUP locations were not adequate to cover the agent's loan payments or other expenses.  Brooke absorbed the costs or advanced funds to the agent to cover them.

48.     Thus, while Brooke's payroll costs increased very quickly to support, manage and control the rapidly growing agency network, its other operating expenses increased even more dramatically, reflecting the cost of continued subsidization of an ever-growing portfolio of troubled agencies.

49.     Brooke periodically disclosed in its forms 10-K its practice of making advances to franchisees either as part of its "cash management services" or its provision of "additional

assistance to franchisees coping with financial stress . . ." or its financial cyclical fluctuations of revenues, receivables and payables with commission advances recorded on franchisees' monthly statements and granting temporary extensions of due dates for franchise statement balances.

50.     Brooke was hemorrhaging excessive amounts of money as it subsidized the expenses (including loan repayments and payment of insurance premiums) of underperforming agencies.  By 2007, these operating expenses had grown so dramatically that, even with an increase of 144 agencies that year, the initial franchise fees were no longer sufficient to cover the year's other operating expenses.

51.     Until the 4th quarter of 2007, Brooke also failed to provide for any loan loss allowances that were needed to reflect the true value of the loans on its books.

### Improper Revenue Recognition

52.     Starting in the fourth quarter of 2003 Brooke began, for the first time, to charge its franchisees a significant initial franchise fee.  The revenue from such fees rapidly became the focus at Brooke and the driver behind Brooke's reported financial results.

53.     In its 2004 Form 10-K Annual Report with the Securities and Exchange Commission ("SEC"), Brooke Corp. recognized the growing significance that initial franchise fees played:

> **Our dependence on initial fees creates an incentive for us to extend credit to borrowers that may not meet stringent underwriting guidelines.**
>
> A significant part of our revenues are derived from one time initial fees we receive from assisting franchisees and others with the acquisition of businesses. Generating fees is largely dependent on our franchisees' and others' ability to obtain acquisition financing from Brooke Credit. Our dependence on these initial fees creates an incentive for us to extend credit to borrowers that may not meet stringent underwriting criteria. Our failure to follow stringent underwriting guidelines could adversely affect the quality of the loans we make and adversely affect our financial condition and results of operations.

(Emphasis in the original).

54. Payment of initial franchise fees were made in exchange for substantial services to be provided by Brooke on an ongoing basis and throughout the franchise relationship. Critically, however, the services and rights provided by Brooke at the outset in exchange for the initial franchise fee were not discrete earnings events.

55. As Brooke put it,

For an initial franchise fee and a share of sales commissions or other revenues, the Company provides franchisor services to its franchisees in accordance with a franchise program pioneered by the Company.

56. Among the services Brooke provided to its franchisees were:

a. Access to Brooke's business model.

b. Use of Brooke's registered trade names.

c. Access to products from Brooke's insurance companies and suppliers;

d. Advertising services;

e. Access to facility support and processing center support;

f. Access to an internet based document management system used by Brooke to maintain all franchisee records on behalf of franchisees and to distribute such records to franchisees;

g. Assistance with obtaining and maintaining franchisee licenses to sell insurance;

h. Negotiation of contracts with insurance carriers on behalf of franchisees; and

i. Cash management services whereby Brooke would collect from the franchisee policy premiums, distribute the premiums to the respective carriers who issued the policies, collect from the carriers commissions earned by the franchisee on the premiums, and distribute the commissions earned to the franchisee after allocating the agreed upon amount to Brooke and deducting the franchisee's expenses.

57.     Pursuant to Generally Accepted Accounting Principles ("GAAP") and relevant SEC guidelines, initial franchise fee revenues must be systematically recognized over the expected life of the franchise relationship.  The reason for this, among other things, is Brooke's continuing obligations to provide various services to franchisees.

58.     Brooke, however, fully recognized the revenues from the initial franchise fee at the inception of the franchise relationship.

59.     Brooke's policy of fully recognizing initial franchise fee revenues at the inception of the franchise relationship constituted a clear violation of GAAP and relevant SEC guidelines.

60.     In various SEC filings and disclosures, Brooke reported significant amounts of equity.  This equity was, however, an illusion resulting from, among other things, Brooke's improper, up-front recognition of initial franchise fee revenues and Brooke's failure to record loan loss allowances associated with franchisees who were unable to service their debt.

61.     Indeed, if Brooke had properly followed GAAP and relevant SEC guidelines, its equity for 2003 through 2007 would have been as follows:

|  | 2003 (millions) | 2004 (millions) | 2005 (millions) | 2006 (millions) | 2007 (millions) |
|---|---|---|---|---|---|
| **Equity** | -$9.5 | -$23.1 | -$44.5 | -$96.8 | -$67.9 [2] |

62.     Succinctly stated, the Debtors were continuously insolvent from 2003 through their respective bankruptcy filings.

---

[2] The decline in negative equity during 2007 is not the result of any improvement in Brooke's financial condition but rather a reflection of the fact that during the year, Brooke sold 38% of its interest in Aleritas and 19% of its interest in Brooke Capital so that at year end a substantial portion of the negative equity was allocated to the holders of those minority interests in Brooke's two largest subsidiaries.

Category D

*Brooke Holdings dealings with Brooke Corporation*

63.     At all times relevant to this lawsuit, Rob Orr directed the affairs of the Brooke entities and of Brooke Holdings.  Rob Orr owned approximately 70% of Brooke Holdings shares.

64.     Leland Orr owned approximately 20% of Brooke Holdings shares.  The remaining shares were owned by various Orr family members and/or friends.  Over time, those shares were repurchased by Brooke Holdings, thus increasing the percentage ownership of Rob and Leland Orr.

65.     As more fully set forth above, Brooke had an unsustainable business model.

66.     Nevertheless, Rob Orr was able to effectuate transfers of substantial sums of cash to himself and his family members by two principal means.  First, Brooke Corp. regularly paid substantial dividends to Brooke Holdings despite the fact that Brooke Corp. was insolvent. Second, Brooke Corp. transferred large sums of cash that were purportedly made in payment of "loans" from Brooke Holdings.

67.     The purported loan from Brooke Holdings to Brooke Corp., however, was nothing more than disguised equity as evidenced by Brooke Holdings filings in this bankruptcy proceeding.  Specifically, on December 22, 2008, Brooke Holdings filed a general unsecured claim against Brooke Corp. in the amount of $11,692,525.25 (Claim No. 336-1).  Brooke Holdings amended that claim on July 13, 2009 (Claim No. 336-2) alleging that $10,097,162.25 was owed.  On August 20, 2009, Brooke Holdings filed a second general unsecured proof of claim (Claim No. 924-1) against Brooke Corp. in the amount of $11,096,002.39 which purported to amend Claim No. 336 that it had previously filed.

68.      The purported basis for Brooke Holdings' claim against Brooke Corp. is an unsigned Promissory Note which was attached to Claim No. 336-1 wherein Brooke Corp. purported to repay to Brooke Holdings $12 million which was allegedly received by Brooke Corp. on March 31, 2008.

69.      However, in its subsequent amendments to its proof of claim, Brooke Holdings attached a 2008 Loan Trial Balance.  *See* attachment to Claim No. 924-1.  The Loan Trial Balance demonstrates that, in fact, Brooke Holdings never loaned $12 million to Brooke Corp. on March 31, 2008.  Rather, there is a purported opening balance of $10,570,000.00 followed by a few subsequent advances of funds from Brooke Holdings to Brooke Corp and a substantial number of transfers from Brooke Corp. to Brooke Holdings.

70.      The supporting documents attached to Brooke Holdings amendments to its proof of claim contradict its original assertion that the underlying debt relates to a Promissory Note. Rather, the Loan Trial Balance demonstrates that Brooke Holdings was making capital contributions to Brooke Corp. at a time when Brooke Corp.'s finances were continuing to deteriorate.

71.      Indeed, during a Rule 2004 examination on October 15, 2010, Leland Orr testified that Brooke Holdings transferred several million dollars to Brooke Corp. in approximately the summer of 2007.  Thereafter, Brooke Holdings attempted to obtain security for the transfer and ultimately obtained the March 2008 promissory note.  Leland Orr further testified that, in connection with that note, whenever Brooke Holdings needed funds it would simply direct Brooke Corp. to transfer funds to it.

72.     Exhibit 1 attached to this Complaint identifies all currently known dividends that Brooke Corp. made to Brooke Holdings in the four-year period preceding Brooke Corp.'s bankruptcy filing.

73.     Exhibit 2 attached to this Complaint identifies all currently known transfers of cash (other than dividends) that Brooke Corp. made to Brooke Holdings in the four-year period preceding Brooke Corp.'s bankruptcy filing.

74.     All dividend distributions and other cash transfers made by Brooke Corp. to Brooke Holdings during this four-year period were made while Brooke Corp. was insolvent.

75.     Subsequent to receiving monies from Brooke Corp., Brooke Holdings, in turn, transferred monies to the other named Defendants.

76.     Exhibit 3 to this Complaint identifies all known transfers to such Defendants.

77.     Upon information and belief, each of the Defendants knew or should have known of the voidability of such transfers at the time they were made.

78.     Brooke Corp. was insolvent at the time it made the transfers identified on Exhibits 1 and 2 and did not receive reasonably equivalent value from Brooke Holdings in exchange for such transfers.

## Count I—Preferential Transfer (11 U.S.C. § 547)

79.     The Trustee repeats and incorporates each of the foregoing paragraphs.

80.     Brooke Holdings was an insider of Brooke Corp.

81.     During the one-year period of time preceding it's bankruptcy filing, Brooke Corp. transferred at least $6,705,640.48 of its funds to Brooke Holdings (as more fully detailed on Exhibits 1 and 2).

82.     The transfer of these funds was purportedly for $2,154,840.48 in stock distributions and repayment of $4,550,800.00 for the alleged Promissory Note.  As such, they constituted a transfer on account of antecedent debt.

83.     Brooke Corp. was continuously insolvent during the one-year period preceding its bankruptcy filing.

84.     Given the number of claims filed against the Debtors' estates as compared to known and potential assets, the Trustee has determined that unsecured creditors will not receive a full distribution from the Debtors' estates for their respective claims.  As such, the transfers identified above enabled Brooke Holdings to receive more than it otherwise would have received had the payments not been made and Brooke Holdings had simply received a distribution from the respective Chapter 7 bankruptcy estates.

85.     The transfers constitute preferential transfers which should be avoided as preferences pursuant to Bankruptcy Code § 547 and are recoverable from Brooke Holdings pursuant to Bankruptcy Code § 550.

WHEREFORE, the Trustee requests that this Court enter a judgment against Brooke Holdings in the amount of $6,705,640.48, prejudgment interest from the date of such transfers, post-judgment interest from the date that judgment is entered against Brooke Holdings, and for all such other relief that this Court deems just and equitable.

## Count II
### Constructive Fraudulent Conveyance
#### (11 U.S.C. § 548(a)(1)(B)  and K.S.A. §§ 33-204(2) and 33-205(a))

86.     The Trustee repeats and incorporates each of the foregoing paragraphs.

87.     As evidenced by Exhibits 1 and 2, during the four-year period preceding Brooke Corp.'s bankruptcy filing, it transferred at least $28,787,994.97 to Brooke Holdings.

88.    Subject to proof, the Trustee pleads in the alternative that one or more of the transfers identified on Exhibits 1 and 2 were not on account of an antecedent debt.

89.    Moreover, none of the Debtors received reasonably equivalent value in exchange for such transfer(s) (the "Potentially Fraudulent Transfers"); and

a.    The Debtors were insolvent on the date that the transfers were made; or

b.    The Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which the property remaining with such Debtors was unreasonably small capital; or

c.    The Debtors intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

90.    The Potentially Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and K.S.A. §§ 33-204(2) and 33-205(a).

WHEREFORE, the Trustee requests that this Court enter a judgment against Brooke Holdings in the amount of $28,787,994.97, prejudgment interest from the date of such transfers, post-judgment interest from the date that judgment is entered against Brooke Holdings, and for all such other relief that this Court deems just and equitable.

## Count III
### Recovery of Avoided Transfers
### (11 U.S.C. § 550 and K.S.A. § 33-207)

91.    The Trustee repeats and incorporates each of the foregoing paragraphs.

92.    Subsequent to the receipt of the monies identified on Exhibits 1 and 2, Brooke Holdings transferred various sums to the other Defendants as more fully itemized on Exhibit 3.

93.     Pursuant to 11 U.S.C. § 550 and K.S.A. § 33-207 and as detailed more fully above, the Trustee is entitled to avoid the transfers made to Brooke Holdings which are identified on Exhibits 1 and 2.

94.     Additionally, pursuant to those same statutory sections, the Trustee may recover all such voidable transfers from the subsequent transferees (each of whom are identified on Exhibit 3).

WHEREFORE, the Trustee requests that this Court enter a judgment against Brooke Holdings for $28,787,994.97 and against the remaining Defendants for the amounts set forth on Exhibit 3.  The Trustee further requests that this Court award him prejudgment interest from the date of such transfers, post-judgment interest from the date that judgment is entered against the Defendants, and for all such other relief that this Court deems just and equitable.

## Count IV—Disallowance of Proof of Claim (11 U.S.C. § 502(d))

95.     The Trustee repeats and incorporates each of the foregoing paragraphs.

96.     Defendants Brooke Holdings, Leland Orr and Anita Lowry have filed claims against Brooke Corp. as follows:

| Claim No. | Claimant | Debtor | Claimed Amount |
|---|---|---|---|
| 336 | Brooke Holdings, Inc. | Brooke Corporation | $11,692,525.25 |
| 924 | Brooke Holdings, Inc. | Brooke Corporation | $11,096,002.39 |
| 9 | Orr, Leland Gayle | Brooke Corporation | $1,291.72 |
| 14 | Orr, Leland Gayle | Brooke Corporation | $10,950.00 |
| 272 | Orr, Leland Gayle | Brooke Corporation | $14,790.29 |
| 256 | Lowry, Anita | Brooke Capital Corporation/ Brooke Corporation | $1,808.16 |
| 262 | Lowry, Anita | Brooke Capital Corporation / Brooke Corporation | $2,276.47 |

97.     Defendants Brooke Holdings, Leland Orr and Anita Lowry are transferees of avoidable transfers under 11 U.S.C. §§ 544, 547 and/or 548.

98.     The Trustee is entitled to avoid and recover monies from Brooke Holdings, Leland Orr and Anita Lowry pursuant to 11 U.S.C. § 550.

99.     Defendants Brooke Holdings, Leland Orr and Anita Lowry have not paid the amount of the avoidable transfers for which they are liable under 11 U.S.C. § 550.

100.    Pursuant to 11 U.S.C. § 502(d), any and all Claims of Defendants Brooke Holdings, Leland Orr and/or Anita Lowry or their assignees must be disallowed until such time as they pay to the Trustee an amount equal to the aggregate amount of the avoidable transfers plus interest thereon and costs.

WHEREFORE, the Trustee requests that this Court enter an Order pursuant to 11 U.S.C. § 502(d) disallowing any and all claims of Defendants Brooke Holdings, Leland Orr and/or Anita Lowry or their assignees until such time as they have paid in full to the Trustee an amount equal to the aggregate amount of the avoidable transfers plus interest thereon and costs

### Count V– Subordination of Claim (11 U.S.C. § 510(c)) and/or Recharacterization of Claim (Brooke Holdings, Inc.)

101.    The Trustee incorporates each of the foregoing paragraphs.

102.    On December 22, 2008, Brooke Holdings filed a general unsecured claim against Brooke Corp. in the amount of $11,692.525.25 (Claim No. 336-1).  Brooke Holdings amended that claim on July 13, 2009 (Claim No. 336-2) alleging that $10,097,162.25 was owed.  On August 20, 2009, Brooke Holdings filed a second general unsecured proof of claim (Claim No. 924-1) against Brooke Corp. in the amount of $11,096,002.39 which purported to amend Claim No. 336 that it had previously filed.

103.    The purported basis for Brooke Holdings' claim against Brooke Corp. is an unsigned Promissory Note which was attached to Claim No. 336-1 wherein Brooke Corp. purported to repay to Brooke Holdings $12 million which was allegedly received by Brooke Corp. on March 31, 2008.

104.    However, in its subsequent amendments to its proof of claim, Brooke Holdings attached a 2008 Loan Trial Balance.  *See* attachment to Claim No. 924-1.  The Loan Trial Balance demonstrates that, in fact, Brooke Holdings never loaned $12 million to Brooke Corp. on March 31, 2008.  Rather, there is a purported opening balance of $10,570,000 followed by a few subsequent advances of funds from Brooke Holdings to Brooke Corp and a substantial number of transfers from Brooke Corp. to Brooke Holdings.

105.    The supporting documents attached to Brooke Holdings amendments to its proof of claim flatly contradict its original assertion that the underlying debt relates to a Promissory Note.

106.    Rather, the Loan Trial Balance demonstrates that Brooke Holdings was making capital contributions to Brooke Corp. at a time when Brooke Corp.'s finances were continuing to deteriorate.

107.    At all times relevant to this matter, Rob Orr and other Orr family members directed and controlled the affairs of the Debtors and Brooke Holdings.

108.    Brooke Holdings had intimate knowledge regarding the financial woes of the Debtors.

109.    As evidenced by Brooke Holdings' own Loan Trial Balance, the unsigned Promissory Note was, upon information and belief, simply an afterthought of Rob Orr and others

to attempt to justify the substantial amounts of monies that the Debtors transferred to Brooke Holdings during the one-year period preceding the Debtors' bankruptcy filings.

110.    The actions of Brooke Holdings (acting through Rob Orr and other family members) were inequitable.

111.    Allowing the Brooke Holdings' debt to remain as a general, non-priority claim would mean that Brooke Holdings would enjoy the same pro-rata distribution as other non-insider, third-parties who dealt with the Debtors.

112.    This, in turn, would result in Brooke Holdings (which is controlled by Rob Orr) effectively obtaining a pro-rata distribution from the Debtors by virtue of Rob Orr's conduct in directing Brooke Corp.'s financial affairs.

113.    Equitable subordination of the Brooke Holdings' claim is not inconsistent with the provisions of the Bankruptcy Code.

114.    Alternatively, recharacterizing Brooke Holding's claim as an equity interest in Brooke Corp. would properly treat the Brooke Holding's claim as both Brooke Holdings and Brooke Corp. considered and treated such interest prior to Brooke Corp.'s bankruptcy filing.

WHEREFORE, the Trustee requests that this Court enter an Order (a) wholly subordinating Brooke Holding's claim to all valid claims filed by wholly-independent creditors or (b) recharacterizing Brooke Holding's claim as an equity interest in Brooke Corp. and (c) for such other relief that this Court deems just and equitable.

**Category D**

Respectfully submitted,

s/ Michael D. Fielding

| | |
|---|---|
| John J. Cruciani | #16883 |
| Michael D. Fielding | #20562 |

HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000; FAX (816) 983-8080
john.cruciani@huschblackwell.com
michael.fielding@huschblackwell.com

*Attorneys for Trustee*

KCP-4060589-5

21

Known Brooke Corp. Dividends to Brooke Holdings, Inc.           **Exhibit 1**

| Date | Amount |
|---|---|
| 11/24/04 | 501,514.20 |
| 12/3/04 | 91,700.00 |
| 3/1/05 | 802,422.72 |
| 3/4/05 | 146,705.00 |
| 5/19/05 | 785,163.20 |
| 6/7/05 | 147,520.00 |
| 8/29/05 | 785,163.20 |
| 9/1/05 | 148,368.00 |
| 11/29/05 | 785,163.20 |
| 12/2/05 | 148,368.00 |
| 2/27/06 | 785,163.20 |
| 3/2/06 | 148,368.00 |
| 5/30/06 | 883,308.60 |
| 6/12/06 | 166,914.00 |
| 8/28/06 | 883,308.60 |
| 8/30/06 | 166,914.17 |
| 11/25/06 | 883,308.60 |
| 11/29/06 | 166,914.00 |
| 2/22/07 | 883,308.60 |
| 2/22/07 | 1,800.00 |
| 3/1/07 | 166,914.00 |
| 5/25/07 | 883,308.60 |
| 5/25/07 | 1,800.00 |
| 5/29/07 | 166,914.00 |
| 8/23/07 | 1,050,222.60 |
| 8/23/07 | 1,800.00 |
| 11/23/07 | 1,050,222.60 |
| 11/23/07 | 6,802.38 |
| 2/22/08 | 1,050,222.60 |
| 2/22/08 | 11,592.90 |
| 2/26/08 | 36,000.00 |
| **Total:** | **13,737,194.97** |

Known Brooke Corp. Transfers to Brooke Holdings, Inc.          **Exhibit 2**

| Date | Name | Amount |
|------|------|--------|
| 06/29/2007 | Brooke Corporation | 10,500,000.00 |
| 02/14/2008 | Brooke Corporation | 140,000.00 |
| 02/26/2008 | Brooke Corporation | 15,000.00 |
| 02/28/2008 | Brooke Corporation | 5,000.00 |
| 02/29/2008 | Brooke Corporation | 270,000.00 |
| 03/06/2008 | Brooke Corporation | 350,000.00 |
| 03/06/2008 | Brooke Corporation | 5,000.00 |
| 03/10/2008 | Brooke Corporation | 50,000.00 |
| 03/12/2008 | Brooke Corporation | 275,000.00 |
| 03/20/2008 | Brooke Corporation | 10,000.00 |
| 03/25/2008 | Brooke Corporation | 10,000.00 |
| 03/26/2008 | Brooke Corporation | 5,000.00 |
| 04/04/2008 | Brooke Corporation | 240,000.00 |
| 04/07/2008 | Brooke Corporation | 100,000.00 |
| 04/11/2008 | Brooke Corporation | 575,000.00 |
| 04/16/2008 | Brooke Corporation | 175,000.00 |
| 04/18/2008 | Brooke Corporation | 20,000.00 |
| 04/21/2008 | Brooke Corporation | 725,000.00 |
| 04/25/2008 | Brooke Corporation | 485,000.00 |
| 04/29/2008 | Brooke Corporation | 1,600.00 |
| 04/30/2008 | Brooke Corporation | 20,000.00 |
| 05/12/2008 | Brooke Corporation | 125,000.00 |
| 05/13/2008 | Brooke Corporation | 200,000.00 |
| 05/22/2008 | Brooke Corporation | 350,000.00 |
| 06/11/2008 | Brooke Corporation | 15,000.00 |
| 06/13/2008 | Brooke Corporation | 105,000.00 |
| 06/26/2008 | Brooke Corporation | 15,000.00 |
| 06/27/2008 | Brooke Corporation | 120,000.00 |
| 07/09/2008 | Brooke Corporation | 25,000.00 |
| 07/17/2008 | Brooke Corporation | 60,000.00 |
| 07/25/2008 | Brooke Corporation | 3,000.00 |
| 07/30/2008 | Brooke Corporation | 2,700.00 |
| 07/31/2008 | Brooke Corporation | 3,000.00 |
| 08/01/2008 | Brooke Corporation | 1,000.00 |
| 08/05/2008 | Brooke Corporation | 30,000.00 |
| 08/11/2008 | Brooke Corporation | 12,300.00 |
| 08/12/2008 | Brooke Corporation | 1,000.00 |
| 08/18/2008 | Brooke Corporation | 2,000.00 |
| 08/27/2008 | Brooke Corporation | 2,000.00 |
| 08/28/2008 | Brooke Corporation | 2,000.00 |
| 09/04/2008 | Brooke Corporation | 200.00 |
| | **Total:** | **15,050,800.00** |

Brooke Holdings Inc.'s Transfers to Third Parties                                    **Exhibit 3**

| Type | Date | Num | Name | Memo | Amount |
|------|------|-----|------|------|--------|
| Check | 1/3/06 | 6000070 | Alfred & Maxine Marcotte | Dividend | 1,250.00 |
| Check | 4/3/06 | 6000075 | Alfred & Maxine Marcotte | Dividend | 1,250.00 |
| Check | 7/3/06 | 6000081 | Alfred & Maxine Marcotte | Dividend | 1,250.00 |
| Check | 10/3/06 | 6000091 | Alfred & Maxine Marcotte | preferred | 1,250.00 |
| Check | 1/2/07 | 6000098 | Alfred & Maxine Marcotte | preferred | 1,250.00 |
| Check | 4/2/07 | 6000103 | Alfred & Maxine Marcotte | preferred | 1,250.00 |
| Check | 7/2/07 | 6000108 | Alfred & Maxine Marcotte | preferred | 1,250.00 |
| Check | 10/2/07 | 6000113 | Alfred & Maxine Marcotte | preferred | 1,250.00 |
| Check | 12/26/07 | 1146 | Alfred & Maxine Marcotte | redemption premium Alfred & Maxine Marcotte | 2,500.00 |
| Check | 12/26/07 | 1146 | Alfred & Maxine Marcotte | dividends to 12/26 Alfred & Maxine Marcotte | 1,191.78 |
| Check | 12/26/07 | 1146 | Alfred & Maxine Marcotte | redeem 5,000 shs Alfred & Maxine Marcotte | 50,000.00 |
|  |  |  | **Alfred & Maxine Marcotte Total** |  | **63,691.78** |
|  |  |  |  |  |  |
| Check | 3/31/08 | Transfer | Anita Lowry | pmt on Lowry loan | 500,000.00 |
| Check | 3/31/08 | Transfer | Anita Lowry | interest paid | 16,876.71 |
|  |  |  | **Anita Lowry Total** |  | **516,876.71** |
|  |  |  |  |  |  |
| Check | 9/15/08 | Debit | Brett Biggs | Cash for taxes on constructive dividend | 15,000.00 |
|  |  |  | **Brett Biggs Total** |  | **15,000.00** |
|  |  |  |  |  |  |
| Check | 4/22/08 | 1220 | Casey Orr | BHI stock purchase of bxxx | 500,000.00 |
| Check | 5/14/08 | wire transf | Casey Orr | BHI stock purchase of bxxx | 100,000.00 |
| Check | 11/28/08 | Debit | Casey Orr | Repayment | 2,000.00 |
|  |  |  | **Casey Orr Total** |  | **602,000.00** |
|  |  |  |  |  |  |
| Check | 3/10/08 | wire transf | Stocton National Bank | loan to Chad Maxwell | 42,000.00 |
| Check | 3/13/08 | 1196 | Stocton National Bank | loan to Chad Maxwell | 31,500.00 |
| Check | 4/14/08 | 1216 | Stocton National Bank | loan to Chad Maxwell | 40,500.00 |
|  |  |  | **Chad Maxwell Total** |  | **114,000.00** |
|  |  |  |  |  |  |
| Check | 8/1/06 | Debit | Kimba Orr | Loan Advance | 151,200.00 |
|  |  |  | **Kimba Orr Total** |  | **151,200.00** |
|  |  |  |  |  |  |
| Check | 1/3/05 | 60000013 | Leland Orr - IRA | Dividend | 225.00 |
| Check | 4/1/05 | 6000028 | Leland Orr - IRA | Dividend | 225.00 |
| Check | 7/1/05 | 6000045 | Leland Orr - IRA | Dividend | 225.00 |
| Check | 9/1/05 | 6000057 | Leland Orr - IRA | Final Dividend | 600.00 |
| Check | 9/1/05 | 6000057 | Leland Orr - IRA | Retire Preferred Stock | 9,000.00 |
| Check | 2/21/07 | 1014 | Leland Orr | cash advance | 20,000.00 |
| Check | 4/16/07 | 2330 | Leland Orr | cash advance | 100,000.00 |
| Check | 12/14/07 | 1138 | Leland Orr | pay back loan from Leland Orr | 60,000.00 |
| Check | 4/17/08 | 1218 | Leland Orr | advance taxes | 210,000.00 |
| Check | 10/29/08 | Debit | Leland Orr | advance legal | 5,000.00 |
|  |  |  | **Leland Orr Total** |  | **405,275.00** |
|  |  |  |  |  |  |
| Check | 11/28/08 | 1173 | Logan Wildlife | Advance | 20,000.00 |
| Check | 12/30/08 | 1174 | Logan Wildlife | Advance | 28,180.00 |
| Check | 12/30/08 | 1174 | Logan Wildlife | Advance | 21,820.00 |
|  |  |  | **Logan Wildlife Total** |  | **70,000.00** |
|  |  |  |  |  |  |
| Check | 11/14/07 | wiretransfe | Michael Lowry | cash advance on loan | 50,000.00 |
|  |  |  | **Michael Lowry Total** |  | **50,000.00** |
|  |  |  |  |  |  |
| Check | 3/29/07 | 1021 | Nick Rhodes | loan to Nick Rhodes | 17,500.00 |
| Check | 5/23/07 | 1037 | Nick Rhodes | loan to Nick Rhodes | 8,000.00 |
| Check | 7/13/07 | 1063 | Nick Rhodes | loan to Nick Rhodes | 20,000.00 |
| Check | 8/2/07 | 1071 | Nick Rhodes | loan to Nick Rhodes | 20,000.00 |
| Check | 8/10/07 | 1075 | Nick Rhodes | loan to Nick Rhodes | 30,000.00 |
| Check | 8/22/07 | 1082 | Nick Rhodes | loan on Nick Rhodes | 30,000.00 |
| Check | 9/12/07 | 1093 | Nick Rhodes | loan to Nick Rhodes | 25,000.00 |
| Check | 10/10/07 | 1109 | Nick Rhodes | loan to Nick Rhodes | 25,000.00 |
| Check | 11/1/07 | 1119 | Nick Rhodes | loan to Nick Rhodes | 50,000.00 |
| Check | 11/16/07 | 1124 | Nick Rhodes | loan to Nick Rhodes | 30,000.00 |

Brooke Holdings Inc.'s Transfers to Third Parties                                      **Exhibit 3**

| Check | 11/26/07 | 1128 | Nick Rhodes | loan to Nick Rhodes | 44,500.00 |
|-------|----------|------|-------------|---------------------|-----------|
| Check | 12/28/07 | 1153 | Nick Rhodes | loan to Nick Rhodes | 30,000.00 |
| Check | 1/16/08 | 1165 | Nick Rhodes | loan to Nick Rhodes | 10,000.00 |
| Check | 1/24/08 | 1168 | Nick Rhodes | loan to Nick Rhodes | 10,000.00 |
| Check | 2/20/08 | 2353 | Nick Rhodes | cash advance Nick & Kaley's loan | 15,000.00 |
| Check | 4/21/08 | Transfer | Nick Rhodes | BHI stock purchase of bxxx | 500,000.00 |
| Check | 5/14/08 | wire transf | Nick Rhodes | BHI stock purchase of bxxx | 100,000.00 |
|  |  |  | **Nick Rhodes Total** |  | **965,000.00** |

| Check | 7/31/06 | 2306 | Steve Schmidt | Loan Advance | 151,200.00 |
|-------|---------|------|---------------|--------------|------------|
| Check | 12/31/07 | 1155 | Steve Schmidt | pmt for BHI stock | 180,000.00 |
| Check | 2/22/08 | 1182 | Steve Schmidt | pmt for BHI stock | 180,000.00 |
|  |  |  | **Steve Schmidt Total** |  | **511,200.00** |

| Check | 1/15/04 |  | Wanda Schmidt | Dividend | 1,750.00 |
|-------|---------|------|---------------|----------|----------|
| Check | 4/23/04 |  | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 7/1/04 |  | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 10/1/04 |  | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 1/3/05 | 60000015 | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 4/1/05 | 6000030 | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 7/1/05 | 6000047 | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 10/3/05 | 6000062 | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 1/3/06 | 6000072 | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 4/3/06 | 6000077 | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 7/3/06 | 6000083 | Wanda Schmidt | Dividend | 1,750.00 |
| Check | 10/3/06 | 6000093 | Wanda Schmidt | preferred | 1,750.00 |
| Check | 1/2/07 | 6000100 | Wanda Schmidt | preferred | 1,750.00 |
| Check | 4/2/07 | 6000105 | Wanda Schmidt | preferred | 1,750.00 |
| Check | 7/2/07 | 6000110 | Wanda Schmidt | preferred | 1,750.00 |
| Check | 10/2/07 | 6000115 | Wanda Schmidt | preferred | 1,750.00 |
| Check | 12/26/07 | 1145 | Wanda Schmidt | redemption premium Wanda Schmidt | 500.00 |
| Check | 12/26/07 | 1145 | Wanda Schmidt | dividend to 12/26 Wanda Schmidt | 1,668.50 |
| Check | 12/26/07 | 1145 | Wanda Schmidt | redeem 7,500 shs Wanda Schmidt | 75,000.00 |
| Check | 12/26/07 | 1145 | Wanda Schmidt | redeem 1,000 shs Wanda Schmidt | 10,000.00 |
| Check | 12/31/07 | 1154 | Wanda Schmidt | pmt for BHI stock | 75,300.00 |
|  |  |  | **Wanda Schmidt Total** |  | **190,468.50** |